## DEVELOPMENT SERVICES, INC. v. JAMES L. SHEEHAN AND ANOTHER.

189 N. W. (2d) 34.

June 25, 1971—No. 42324.

*Soules & Metchnek,* for appellant.

*Popham, Haik, Schnobrich, Kaufman & Doty, Wayne G. Popham,* and *Robert H. Zalk,* for respondents.

Heard before Knutson, C. J., and Otis, Peterson, Kelly, and Rosengren, JJ.

KELLY, JUSTICE.

Plaintiff sued defendants for $13,000 as commission due for the procurement of a loan. The lower court found for defendants and thus this appeal.

On June 23, 1965, defendants signed a loan procurement contract with Neil Larson whereby Larson would be paid 1½-percent commission on the principal amount of the mortgage if he could obtain a $650,000 mortgage amortized over 20 years with

6-percent interest per annum. An additional commission of one-half percent of the principal was to be paid to Larson if he could obtain interim construction financing. The commission was to "be considered earned, due and payable as of the date the firm commitment is issued." The firm commitment was "to provide the financing as applied for, or in any other amount and/or at any other terms which the undersigned shall agree in writing to accept." Larson thereafter assigned all of his interest in the contract to plaintiff.

Larson prepared a written presentation and contacted three financial institutions, including Midwest Federal Savings and Loan Association (then known as Minneapolis Federal Savings and Loan Association, hereafter referred to as Midwest).

On October 25, 1965, Midwest by a letter to defendant James Sheehan made a tentative commitment for the loan sought by defendants, stating therein:

"This is estimated strictly upon the appraisal submitted by you, and a firm commitment will be given upon receipt of detailed plans, specifications, bids and itemized sworn construction statement, as well as proof of ability of the borrowers to qualify for such a mortgage. Approval of our Loan Committee must be made after final appraisal."

In early January, Midwest issued an oral commitment to furnish interim construction financing and for a loan of $650,000, to be discounted at 2 percent, to carry an interest rate of 6½ percent and to be amortized over a 25-year period, with a proviso that "[t]he commitment will become firm upon [Midwest's] approval of your mortgage application."

On January 13, 1966, defendants accepted the oral commitment by signing a mortgage loan application embodying the following pertinent provisions:

"* * * Sworn construction statement and lien waivers required *yes.*"

"* * * Notwithstanding an agreement of the Association to

make this loan, it is understood that the same may be rejected by the Association for falsity in any statement in this application * * *."

The mortgage application for $650,000 was approved by Midwest's board of directors on January 27, 1966. Notice of the loan approval was communicated to defendants, who subsequently signed the mortgage note and mortgage deed on March 2, 1966.

On January 3, 1966, defendants and Kaye Construction, Inc., entered into a contract for the construction of a nursing home for a flexible price of $638,228, "unless that price would create an undue hardship for the owner or the contractor in which case the price could be reopened."

Kaye Westerlund, president of Kaye Construction, and defendant John J. Mondati cosigned a sworn construction statement for Midwest on May 26, 1966, stating the cost of construction to be $868,050. In the declaration contained in the sworn construction statement, the signers declared under oath that the statement included "the amounts due and to become due" to each contractor and subcontractor and "that no arrangements of any kind whatsoever have been entered into with any person involving any trade, or the payment of monies, credits, refunds, or services which are not fully explained or in attached statement." There was no attached statement. A consulting engineer testified that "ordinary construction practice would dictate that the figures in the construction statement would be identical to the figures in the construction contract."

In late June or early July of 1966, when Westerlund contacted Midwest to obtain the first mortgage money, the commitment for the loan was withdrawn by Midwest and the reason given by Harold Greenwood, president of Midwest, was "discrepancies or irregularities in the sworn construction statement." Robert M. Urahn, chief appraiser for Midwest, gave testimony to the same effect. Upon learning that the commitment had been revoked, defendants' attorney contacted Greenwood to inquire if defendants would be allowed to submit "another sworn construc-

tion statement." Greenwood replied that Midwest "would review it again" if defendants would "submit another sworn construction statement to Mr. Urahn." Larson was not informed of the withdrawal of the commitment and apparently was given no opportunity to renegotiate with Midwest.

Defendants through an attorney reapplied for the loan on July 5, 1966. Except for an increased interest rate from 6½ percent to 7½ percent, the terms and provisions of the second application were substantially identical to those of the first application although the term of the loan was increased to 30 years. The application was approved on July 7, 1966. The revised construction statement of $656,728 was furnished July 11, 1966, and the mortgage note and mortgage deed were executed the same day. The initial disbursement of the loan was made on July 26, 1966.

The testimony of Westerlund disclosed that the May 26, 1966, construction statement, which was the first one submitted to Midwest, was false. He testified: "I was told to make a construction statement that would indicate a cost greater than the actual cost." The second construction statement submitted to Midwest of $656,728 included the architect's fee of $18,000, which was not a part of the first construction statement. The second construction statement, without the architect's fee, approximated the contract price of $638,278.

Plaintiff invoiced defendants for the brokerage commission in the amount of $13,000 ($650,000 x 1½ percent, plus $650,000 x one-half percent), but defendants refused to pay any portion of the commission. Plaintiff sued and the trial court found for defendants.

The issue is whether a brokerage commission is payable on a firm commitment that would have been consummated except for defendants' furnishing of false information to the mortgagee contrary to a condition of the commitment.

This court has stated in Olson v. Penkert, 252 Minn. 334, 343, 90 N. W. (2d) 193, 200:

"We think the rule well established that, if the efforts of the

broker are rendered a failure by the fault of the employer, the broker does not lose his commission. *This rule is based upon the familiar principle that no one can avail himself of the nonperformance of a condition precedent who has himself occasioned its nonperformance.* Usually a broker is entitled to a fair and reasonable opportunity to perform his obligation. * * *

* * * * *

"* * * [A] broker is entitled to his compensation upon the completion of the negotiations which he undertook, irrespective of whether or not the contract negotiated is actually consummated * * *."

And in Schramsky v. Hollmichel, 233 Minn. 481, 484, 47 N. W. (2d) 177, 179:

"It is well settled that a broker is entitled to his commission when he has performed all that he undertook to perform, and this necessarily depends upon the agreement of the parties."

Although Olson and Schramsky involve real estate brokers, the reasoning and rules of law contained in those cases should apply to the issues in the instant case. In essence, the broker in this case was to be paid a commission upon receipt of a firm commitment to provide the financing applied for or financing in any other amount or at any terms which defendants agreed in writing to accept. Defendants agreed in writing to accept interim financing and a loan for $650,000 subject to certain terms and conditions contained in their loan application, which was on a Midwest form. Midwest approved the loan application and communicated this information to defendants, and at this point of time defendants had a firm commitment for the financing as described in their application subject only to routine conditions and requirements contained in the application, the only provision pertinent here being a requirement that defendants furnish a sworn construction statement and lien waivers and a condition that, notwithstanding the agreement to make the loan, Midwest might revoke the same for any falsity in any statement

in the application. By executing the application, defendants agreed in writing to accept the terms and conditions of the loan arranged for by plaintiff. Midwest approved the application on January 27, 1966, and defendants confirmed the acceptance by executing the first mortgage and note on Midwest forms on March 2, 1966.

The loan procurement agreement between Larson and defendants did not require a consummation of the loan agreement between the lender and defendants as a prerequisite to the earning of a commission. In fact, the agreement did not require anything other than the obtaining of a firm commitment. If defendants had complied with the requirements of the commitment, certainly Midwest would have been legally bound to honor their agreement.

There is nothing in the record to indicate that plaintiff had a duty to provide a sworn construction statement on behalf of defendants. Obviously, this statement had to be made up by defendants' contractor since he was only one who had sufficient information relative to the details required by the Midwest form used for that purpose. Midwest required that the statement be executed by the contractor or the defendants. Defendants were informed that the sworn construction statement, as well as lien waivers, had to be furnished by them, this requirement having been clearly set forth in the January 13, 1966, loan application signed by defendant Mondati.

Plaintiff had fully performed on its part when it obtained a firm commitment for the financing subject only to routine conditions and requirements which were accepted by defendants. Midwest's refusal to perform was occasioned by the falsity of the first sworn construction statement, the blame for which falls solely on defendants because of their instructions to their own contractor to make it false. Defendants could have furnished a truthful sworn construction statement without difficulty. The giving of the false statement apparently was the only permissible reason Midwest had for canceling its loan commitment. The fact

that interest rates had gone up might have motivated Midwest to revoke the commitment but could not have been a justifiable ground for doing so. Plaintiff, having fully performed its agreement by furnishing a firm commitment subject to conditions accepted by defendants, should not lose its commission because defendants occasioned the nonperformance of the commitment by submitting a false construction statement.

We are not unmindful of the letter of October 25, 1965, from Midwest to defendant Sheehan to the effect that the commitment would become firm when it received, among other items, a sworn construction statement. However, the first application executed by defendants on January 13, 1966, and accepted by Midwest appears to be all-inclusive and contains no reference to the October 25 letter. There is nothing in the record to indicate that defendants accepted provisions of the letter of October 25. For all practical purposes, the application dated January 13, 1966, and approved by Midwest January 27, 1966, became the loan agreement between Midwest and defendants. When Midwest accepted the executed note and mortgage of defendants, it must have thereby acknowledged and confirmed the acceptance of the loan application.

Whether or not the loan commitment was firm is not a matter of great moment under the principle enunciated in Olson v. Penkert, 252 Minn. 334, 343, 90 N. W. (2d) 193, 200, that "if the efforts of the broker are rendered a failure by the fault of the employer, the broker does not lose his commission." The efforts of the broker here were rendered a failure by defendants' giving of a false sworn statement to Midwest.

We hold that plaintiff earned its commission when its efforts were rendered a failure by the fault of defendants. We do not reach the question of whether or not plaintiff was the procuring cause of the loan ultimately made to defendants by Midwest and accordingly hold that Rees-Thomson-Scroggins, Inc. v. Nelson, 276 Minn. 453, 150 N. W. (2d) 568, has no application here.

The lower court is reversed with directions to enter judgment

for plaintiff for the sum of $13,000, plus interest, costs, and disbursements.